**JOHN MORRELL & CO.,**
**Plaintiff–Appellee,**

v.

**UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL–CIO; Benard J. Aning, as representative of a defendant class, Defendants–Appellants.**

No. 93–2863.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 16, 1994.

Decided Oct. 12, 1994.

Irving M. King, Chicago, IL, argued (Kelly J. Hupfeld, on the brief), for appellants.

Wilber H. Boies, Chicago, IL, argued (Jeremiah D. Murphy, Sioux Falls, SD, on the brief), for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

LOKEN, Circuit Judge.

John Morrell & Co. ("Morrell") and the United Food and Commercial Workers (the "Union") were parties to "Master" collective bargaining agreements from the 1940's until April 1, 1989. In 1991, after negotiating a new collective bargaining agreement, Morrell and the Union disagreed over whether the expired Master Agreements obligate Morrell to pay continuing health benefits to hourly employees who retired before April 1, 1989.[1] Morrell commenced this action against the Union and a class of retired hourly employees (the "Class") seeking a declaration that it may unilaterally modify or terminate those health care benefits. The Union contends that these are vested lifetime benefits, a legal issue governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

After the district court[2] denied the Union's motion to compel arbitration, the parties completed discovery and proceeded to trial.[3] Following a four-day bench trial, the district court found that the retiree health benefits afforded in the various Master Agreements were limited to the three-year term of each Agreement. Accordingly, the court concluded that those benefits are not contractually vested under the Master Agreements nor legally vested under ERISA and granted Morrell the requested declaratory relief. *John Morrell & Co. v. United Food & Commercial Workers Int'l Union,* 825 F.Supp. 1440 (D.S.D.1993). The Union and the Class appeal. We affirm.

## I. Governing Legal Principles.

ERISA requires that pension plans meet minimum vesting standards. *See* 29 U.S.C. § 1053. But vesting is not mandatory for "employee welfare benefit plans"—plans that offer the health care benefits here at issue. *See* 29 U.S.C. §§ 1002(1), 1051(1). An employer may unilaterally modify or ter-

1. Like the parties, we will use the phrase "hourly employees" to mean Morrell employees who are represented by the Union. Thus, an hourly employee who retired before April 1, 1989, was covered by a Master Agreement when he or she retired.

2. The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota.

3. On appeal, the Union argues that we should compel arbitration. However, the Union waived this issue when it did not appeal the denial of its motion to compel arbitration, causing the parties to incur the expense of discovery and a trial on the merits. *See Ritzel Communications, Inc. v. Mid-American Cellular Tel. Co.,* 989 F.2d 966 (8th Cir.1993). A party may not "allow the substantive lawsuit to run its course (which could take years), and then, if dissatisfied with the result, seek to enforce the right to arbitration on appeal from the final judgement." *Cotton v. Slone,* 4 F.3d 176, 180 (2d Cir.1993).

minate health benefits "absent the employer's contractual agreement to the contrary," *Howe v. Varity Corp.*, 896 F.2d 1107, 1109 (8th Cir.1990), even if some benefits have been paid, *see Meester v. IASD Health Servs. Corp.*, 963 F.2d 194, 197 (8th Cir.1992). Thus, although ERISA is the governing law, this case turns on whether vested health benefits were contractually conferred in the Master Agreements between Morrell and the Union. The Union has the burden of proof on this issue. *See Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1516–17 (8th Cir.1988), *cert. denied*, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).

■ The Master Agreements each contained multiple appendices setting forth various employee benefit plans. For example, Appendix G contained the Supplemental Agreement on Pensions. Consistent with ERISA, Appendix G included vesting provisions and expressly referred to "Vested Pensions." On the other hand, Appendix F, which contained the health care benefits here at issue, had no express vesting provisions. The Union argues that an intent to confer vested benefits may nonetheless be derived from ambiguous language in Appendix F construed in light of the parties' lengthy collective bargaining history. The Union shoulders a difficult, though not impossible, burden of persuasion with this argument, since courts are reluctant to read more benefits into an ERISA plan than its plain language confers. *See Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993); *Howe*, 896 F.2d at 1110; *DeGeare v. Alpha Portland Indus., Inc.*, 837 F.2d 812, 816 (8th Cir.1988), *vacated and remanded on other grounds*, 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989).

## II. The Collective Bargaining History.

■ The express terms of an ERISA plan determine the benefits it confers. But the plans at issue were appendices to collective bargaining agreements, and it is usually unwise to construe collective bargaining agreements without regard to their bargaining history. Therefore, before examining the relevant Master Agreement provisions, we will review the negotiating history of those Agreements as it relates to retiree health benefits.

Prior to 1976, Morrell and the Union bargained the issue of health care benefits for retired employees and expressly included such benefits in the Master Agreements. For example, Appendix F to the 1973 Master Agreement provided:

> 8.12 Retirement: *All retirees currently furnished ... coverage and* all Employees who retire during the term of the Master Agreement shall be furnished hospital, medical and surgical insurance at Company expense through a plan as provided by the Company.

(Emphasis added.) The 1973 Master Agreement also contained a term clause expressly limiting the duration of the Appendix F benefits:

> 103. The Hospital–Medical–Surgical Insurance Plan described in Appendix F will remain in effect for the duration of this Agreement.

Each subsequent Master Agreement contained a similar term clause, as well as a general clause limiting the duration of all the Master Agreement's provisions to its three-year term.

The parties changed § 8.12 of Appendix F in the 1976 Master Agreement by deleting the reference to "All retirees," so that Morrell's only express undertaking was to provide continuing health benefits for employees who would retire during the term of that Master Agreement. The district court attributed this change to the Supreme Court's decision in *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), that bargaining for retired employees is a permissive rather than a mandatory subject of collective bargaining. Relying on *PPG*, Morrell took the position in 1976 that previously retired hourly employees were no longer members of the bargaining unit, and the Union acquiesced.

Although the 1976 Master Agreement did not refer to past retirees, the parties negotiated the subject of retiree health benefits. In January 1977, Morrell announced that

retired hourly employees would be provided improved health benefits, including a new cost reduction plan for prescription drugs and some Medicare reimbursement. These changes were made retroactive to the effective date of the 1976 Master Agreement, and Morrell subsequently represented to this court that they were made "as a result of union negotiations."[4]

In 1979, Morrell and the Union negotiated another Master Agreement. Again, health benefits for retirees were discussed but not included.[5] Instead, Morrell and the Union signed a July 12, 1979, "side letter" reciting that Morrell has no duty to bargain retiree benefits but "has advised the Union that, as a matter of Company policy, the Company intends to announce that effective September 1, 1979, the Company will extend the following benefit programs to retirees currently covered by a Company H.M.S. Plan." When the 1979 Master Agreement became effective, Morrell wrote existing retirees that it was "pleased to announce an improvement" in their health care benefits. Lee Bishop, who negotiated the 1979 Master Agreement with the Union, testified that Morrell made a significant change to retiree health benefits in 1979:

> Prior to this time ... Morrell had engaged in what I would refer to as stairstep· programs for past retirees. In other words, if you retired [in] 1969, you got one set of benefits; and if you retired in 1973, you got a differen[t] set of benefits.... so that we had multiple plans in existence for past retirees. The company's determination was ... that we would discontinue the stairstep approach and put all the past retirees under the same program.

Although Bishop described these as unilateral changes, Morrell's brief to this court in *Anderson v. John Morrell & Co.* stated, "In 1979, as a result of union negotiations, the Company once again retroactively improved the benefits available to union retirees."

When the 1979 Master Agreement expired in 1982, the Union went on·strike. Morrell terminated health care benefits for the strikers but continued to pay benefits to hourly retirees. After the parties negotiated a new collective bargaining agreement, Morrell reopened negotiations when a major competitor obtained wage and benefit concessions from the Union. In late 1983, the Union accepted lower wages and benefits from Morrell as well, reflected in a new Master Agreement made retroactive ·to September 1, 1982. Once again, Appendix F provided retirement benefits only for employees who retired during the life of the Agreement.[6] However, on January 12, 1984, Morrell sent past hourly retirees a letter stating in part:

> During these negotiations with the Union, the parties agreed that no reductions would be made in retiree pensions.[7] However, the Company and the Union did agree that your retiree medical benefit program will be modified to provide the same general level of benefits negotiated for active employees for those benefits applicable to retirees.... Benefits have been improved in some areas, particularly as it relates to catastrophic type illnesses. On the other hand, the deductibles and coinsurance have been modified so that you will share in some of the costs covering initial treatments and minor ailments.
>
> \*   \*   \*   \*   \*   \*
>
> John Morrell & Co.·is pleased to be able to continue to provide retirees with a medical benefits plan.

Morrell also sent retirees a Summary of Hourly Retiree Medical Benefit Program that stated, "This Benefit Program is subject

---

4. This quote is taken from page five of Morrell's March 21, 1986, brief in *Anderson v. John Morrell & Co.*, No. 86–5017–SD, later reported at 830 F.2d 872 (8th Cir.1987).

5. For example, the 1979 Master Agreement provided that union employees who retired after September 1, 1979, would be covered under Morrell's Vision Plan. This benefit was not extended to previously retired hourly employees until January 1, 1984.

6. A 1983 Memorandum of Agreement stated that "present retirees ... shall be covered" by Appendix F. The district court found that this referred to employees who retired after the 1979 Agreement expired but before the 1982 Agreement was negotiated.

7. A disingenuous statement since pension benefits are vested by law under ERISA.

to modification and termination in accordance with applicable law."

When the 1982 Master Agreement expired on September 1, 1985, the Union again went on strike, and Morrell again stopped paying health benefits to striking employees while continuing them for hourly retirees. In the subsequent 1985 Master Agreement, Appendix F made no mention of past retirees, and, like its predecessors, was limited to the duration of the three-year Master Agreement.

In 1987, the Union again went on strike. When the parties negotiated to an impasse in early 1989, Morrell unilaterally implemented new wage and benefit terms. A new collective bargaining agreement went into effect in January of 1991. Morrell sent a memorandum to hourly retirees on March 31, 1991, that included the statement, "The Company reserves its legal right, at its sole discretion, to alter, modify, or terminate any plan or benefit at any time." The Union responded that any such action "would violate the Union's applicable collective bargaining agreement as well as the rights of the retirees." Morrell then commenced this action.

On appeal, each party strives to put a favorable gloss on this long collective bargaining history. Morrell argues that, since 1976, it has carved past retiree health benefits out of the collective bargaining process and treated them as a matter of "employer grace." But as the above-quoted passages from Morrell's brief to this court in *Anderson v. John Morrell & Co.* make clear, the health benefits Morrell provided to hourly retirees prior to April 1, 1989, were in fact the product of collective bargaining. They were not included in the Master Agreements, and perhaps they were not collectively bargained in a narrow sense of that term. But as each Master Agreement was negotiated, the Union made requests for improved retiree health benefits, Morrell devised and presented a detailed array of health benefits it would provide to past retirees "as a matter of company policy," and the Union acquiesced in Morrell's proposal, either by signing a

document like the July 12, 1979, side letter, or by its silence. As Morrell negotiator Lee Bishop admitted at trial, Morrell was aware that it would be harder to negotiate a new Master Agreement for the active employees if the Union was upset with the Company's treatment of past hourly retirees.

On the other hand, the Union's view of the collective bargaining landscape is even more distorted. The Union recognizes that the Master Agreements after 1973 made no mention of past retirees and therefore cannot be construed as providing vested benefits to already retired hourly employees. The Union instead argues that each retiree has a vested right to the level of retirement health benefits afforded in the Master Agreement in effect when he or she retired. But that view of the Master Agreements does not square with the parties' bargaining history.

■ In every negotiation after 1973, the Union requested improved health benefits for past retirees. Starting in 1979, Morrell eliminated its prior "stairstep" approach—which on its face was consistent with the Union's vesting argument—and adopted, with at least implicit Union approval, a single health benefits package applicable to all past retirees. Thereafter, prior to the signing of each new Master Agreement, Morrell and the Union negotiated, and Morrell subsequently implemented, a modified health benefits package for past retirees. As Morrell's January 12, 1984, letter to retirees illustrates, the modifications included both increases and decreases in the level of benefits, yet neither the Union nor any member of the Class ever objected that such changes violated vested rights.[8]

Faced with this inconsistency at oral argument, the Union suggested that each subsequent modification is part of the retirees' vested benefits. But those modifications were the product of either side deals or unilateral Morrell action, depending upon one's views of the collective bargaining.

---

8. Even if a union collectively bargains benefits for past retirees, "vested retirement rights may not be altered without the pensioner's consent." *PPG*, 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. Morrell's modified retiree health benefit plans were never submitted to past retirees for approval, which suggests that neither Morrell nor the Union thought they were modifying vested benefits.

They are not to be found in the Master Agreements, which are the basis of the Union's vesting claims. In short, there is no basis for concluding that later modifications to a retiree's initial level of health benefits are vested. Rather, the fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested. *See Anderson v. Alpha Portland,* 836 F.2d at 1519.

For the foregoing reasons, we conclude that the history of collective bargaining between Morrell and the Union does not support the Union's claim that hourly retirees' health benefits are vested. With that background, we turn to the provisions of the Master Agreements as construed by the district court.

## III. The Master Agreement Provisions.

The Master Agreements contain many provisions that reflect an intent to confer only non-vested retiree health benefits.

1. The absence of any explicit vesting language in Appendix F is strong evidence of the parties' intent to limit retiree benefits to the term of the Master Agreement. By contrast, the pension benefits in Appendix G were expressly referred to as vested.

2. As noted above, each Master Agreement contained a term clause expressly limiting the duration of the retirement health benefits contained in Appendix F to the duration of the Master Agreement. We held in *Anderson v. Alpha Portland Industries* that similar language was inconsistent with an intent to vest health benefits for·life: "[i]t would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date." 836 F.2d at 1519; *see also Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 609 (7th Cir.) (en banc) ("employers adamant against assuming perpetual obligations can eliminate all doubt by insisting on a clause that makes any entitlement to health benefits granted by the agreement expire on the date the agreement expires"), *cert. denied,* — U.S. —, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993).

3. The provision in the 1973 Master Agreement that continued health benefits for past retirees is evidence that prior benefits were not vested. *See Anderson v. Alpha Portland,* 836 F.2d at 1518–19; *DeGeare,* 837 F.2d at 816. Likewise, as noted above, Morrell's "unilateral" adoption of a modified health benefits package for past retirees with the signing of each new Master Agreement is evidence that prior benefits were not vested.

4. Appendix F in several of the Master Agreements contained a coordination-of-benefits provision. We have held that such provisions are also inconsistent with vesting. *See Anderson v. Alpha Portland,* 836 F.2d at 1519.

In the face of this substantial textual evidence that retiree health benefits are not vested, the Union points to relatively little in the Master Agreements to the contrary. First, the Union refers us to § 9.1(b) of Appendix F to the 1979 Master Agreement, a provision that also appeared in the 1982 and 1985 Agreements:

(b) After Retirees Death:

\*    \*    \*    \*    \*    \*

(2) When a Retired Employee dies who has selected a joint and survivor form of pension, the above coverage shall continue for the surviving spouse and dependent children until the earlier of the surviving spouse's death or remarriage. . . .

The Union argues that this language expressly vests an eligible spouse with Appendix F retirement health benefits until the spouse's death or remarriage. We have previously noted that such language does support the argument that eligible survivor benefits are vested. *See Local Union No. 150–A, United Food & Commercial Workers Int'l Union v. Dubuque Packing Co.,* 756 F.2d 66, 69–70 (8th Cir.1985). But in the context of this case, it is equally plausible to construe this provision as providing that a surviving spouse who is eligible to receive a joint and survivor pension—which is vested—will also receive whatever non-vested retiree health benefits Morrell provides from time to time. Under this provision, the eligible survivor receives only the "above coverage," which is

limited to the three-year term of Appendix F and the Master Agreement. Thus, § 9.1(b) is ambiguous and cannot overcome the other provisions, such as the term clauses, that are inconsistent with vesting.

Next, the Union relies upon two additions to Appendix F in the 1982 and 1985 Master Agreements. First, the preamble to Appendix F in those Agreements stated: "This Agreement ... other than as provided under Section B [the retirement benefits section], shall be subject to termination, modification or extension upon the termination of [the] Master Agreement." That language, the Union argues without supporting trial testimony, vested all the retirement health benefits contained in Section B. But there is no general reference to vesting in Section B. Rather, there is one specific provision—Article III—that conferred fixed five-year health benefits on "Separation Retirees," workers between the ages of 50 and 54 who elected a separation pension after a plant closing. Absent extrinsic evidence to the contrary, we believe that the preamble's exception—"other than as provided under Section B"—was simply a cross reference to the limited vested retirement health benefits conferred in Article III of Section B.

Second, the Union finds an intent to vest retirement health benefits in § 4.1 of Section B in the 1982 and 1985 Agreements:

> 4.1 The above retirement benefit plan was based upon certain economic conditions in existence at the time such plan was negotiated by the Company and the Union. Therefore, the Company and the Union reserve the right to subsequently alter, modify, increase or reduce the benefits and coverages provided herein, at any time, including subsequent to the Employee's retirement date, if changes occur in the costs of this retirement benefit, or if economic conditions of the meat industry or the Company change, but any modification to the plan shall be only upon mutual agreement by the Company and the Union.

The Union construes § 4.1 as meaning that the Union must agree to any modification of retiree health benefits, even after the Master Agreement has expired. Even accepting the Union's interpretation of this provision, it is further evidence that both Morrell and the Union recognized that retirement health benefits were subject to periodic modification, a recognition inconsistent with the Union's contention that each Master Agreement conferred vested benefits. Moreover, Morrell's uncontroverted trial testimony gave § 4.1 a very different meaning—it was an exception to a Company concession not to reopen these Master Agreements prior to their expiration. In other words, § 4.1 was an express recognition by the Union that retirement health benefits could be the subject of additional negotiations *before* the Master Agreements expired.

From the above, we conclude that both the plain meaning of the Master Agreements, and the collective bargaining context in which they arose, support the district court's determination that the Class's retirement health benefits are not contractually vested.

## IV. Morrell's Fiduciary Duty.

■ Finally, the Union argues that even if the Class does not have vested retirement benefits, Morrell would violate its fiduciary duties under ERISA by unilaterally modifying or terminating those benefits. This argument is without merit. ERISA does not bar an employer that is also a fiduciary from exercising its business judgment to modify non-vested welfare benefits. *See United Paperworkers Int'l Union v. Jefferson Smurfit Corp.,* 961 F.2d 1384, 1386–87 (8th Cir.1992).

The judgment of the district court is affirmed.

HEANEY, Senior Circuit Judge, dissenting.

I agree that vesting is not mandatory under ERISA for employee welfare benefit plans. I also agree that the Union waived its right to compel arbitration. My agreement ends there, however. The Union does, of course, have the burden of proving that the employee welfare benefits were contractually vested, but this burden is no greater and no less than in any other contract case. *See Howe v. Varity Corp.,* 896 F.2d 1107, 1109 (8th Cir.1990); *Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1517 (8th Cir.

1988), *cert. denied,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989); *Local Union No. 150–A, United Food & Commercial Workers Int'l Union v. Dubuque Packing Co.,* 756 F.2d 66, 70 (8th Cir.1985). In my view, the Union has more than sustained its burden. Thus, I respectfully dissent.

### The Collective Bargaining History

The single most powerful, undisputed fact in this record is that every hourly employee who retired between 1957 and January 1, 1989, received health benefits from Morrell from the time of retirement until death. The retirees received these benefits without interruption even though the collective bargaining agreement terminated on several occasions during this period and even though the Union went on strike on some occasions. The health benefits did change from time to time, usually to the benefit of the retirees, during the forty-two-year period, but always by agreement between Morrell and the Union. No retiree complained about the changes that were made.

A second undisputed fact is that, upon retirement, each hourly employee was given the option of selecting a joint survivor form of benefits. Upon the death of a retiree who elected joint survivorship benefits, Morrell informed the surviving spouse that health benefits would continue until the spouse died or remarried. Jt.App. 823, 919 (§ 9.1(b)(2) of Appendix B of 1979 Master Agreement), 946. Larry McFarland, a retired employee of Morrell, testified that "I was told by [LaVonne Hoffman, Butch Anderson, Gary Junso, and Tim Sinsky] that I would have the benefits for the rest of my life as well as at the time of my death. If I left the percentage in there for my wife, she would receive the benefits for the rest of her life." *Id.* at 590. In his affidavit dated April 21, 1992, Les Sundermann, another retired employee of Morrell, stated:

> I selected a joint and survivor pension option because I knew that this form of pension would guarantee medical insurance for my wife after my death.... [T]he form given to me to take home and fill out ... also said at the bottom that my wife would have the health insurance after

my death if I selected the joint and survivor option.

*Id.* at 1733. Another retired employee ·of Morrell, Bob Smelser, stated in his affidavit dated April 20, 1992, as follows:

> I chose an optional form of pension (joint and survivor pension) specifically so that my wife would be covered by the benefits after my death. The outline of the pension options which I received in the mail from the Company contained a statement, in · large capital letters at the bottom, as follows:
>
> HEALTH INSURANCE BENEFITS FOR YOUR SURVIVING SPOUSE WOULD BE PROVIDED BY THE COMPANY ONLY IF YOU CHOOSE A JOINT AND SURVIVOR PENSION.

*Id.* at 1741. In addition, Paragraph F of a form entitled "Retirement Information" states that "[f]or continued health care benefits for an employee's spouse and dependents beyond the life of the retiree, employee must select a Joint & Survivor Form of Pension." *Id.* at 1743; *see also* Trial Testimony of Rodger Tibke, *id.* at 601; Affidavit of Francis Krier (Apr. 20, 1992), *id.* at 1749; Affidavit of George Zuraff (Apr. 21, 1992), *id.* at 1752. Again, it is undisputed that Morrell continued these spousal benefits without interruption during those times that the union employees were on strike and no, collective bargaining agreement was in effect.

A third undisputed fact is that not once during the period from 1957 through December 19, 1985, did Morrell inform the Union, the active employees, or employees about to retire that it had the right to terminate retiree health benefits. In his affidavit of April 21, 1992, Jim Jarman, a retired employee of Morrell, states:

> Neither Lavonne Hoffman or any other person ever advised me that my pension was guaranteed and fixed but that my health insurance benefits were not. I have never at any time heard any representative of John Morrell & Co. make that statement or any statement that the health insurance benefits for employees who have retired are not guaranteed, fixed, and vested in accordance with the agreements between Morrell and the UFCS Union.

*Id.* at 1729. Another retired employee of Morrell, Jerry Nelson, stated in his affidavit of April 20, 1992, that "[n]o one told me that my health benefits were not guaranteed, fixed or vested and no one ever told me that it was the Company's position that those benefits could be modified or terminated by the Company. In fact, I have never at any time heard any representative of the Company make such a claim." *Id.* at 1736; *see also* Affidavit of Don Reiter (Apr. 23, 1992), *id.* at 1738; Affidavit of Ronald Christianson (Apr. 21, 1992), *id.* at 1758; Affidavit of Marcene Williscroft (Apr. 21, 1992), *id.* at 1763. Indeed, it was not until July 12, 1979, that Morrell intimated that health benefits for employees and retirees was a matter of "employer grace" rather than a matter of contract. On that date Morrell wrote to the Union:

> The Company has taken the position that it has no legal obligation to bargain with the Union with respect to the benefits of past retirees.
>
> *Without any waiver of the legal position of either party, however,* ... the Company will extend the following benefit programs to retirees currently covered by a Company H.M.S. Plan and who have retired prior to September 1, 1979, under the [retirement provisions] of the 1957, 1959, 1961, 1964, 1967, 1970, 1973, and 1976 Supplemental Agreements on Pensions.

*Id.* at 932 (emphasis added). By the terms of this letter, which the Union signed and accepted, the Union fully preserved its legal position that no changes could be made in the health benefits of currently retired employees without its consent.

A fourth undisputed fact is that all during the years in question, health benefits for active and retired employees alike were the subject of negotiations between Morrell and the Union. Although it is true that after the Supreme Court's decision in *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), Morrell was not legally required to bargain with the Union over retiree health benefits, it is equally true that it did bargain over this issue and it must keep the bargain it made. Even Morrell's chief negotiator, M.

Lee Bishop, conceded that "it was in the company's best interests to provide past hourly retirees with certain benefit improvements. And it related largely to the contract negotiations that were going on at that time." Jt.App. 1712. Simply stated, retiree health benefits were an element, along with wages, hours, pensions, and other fringe benefits, to be considered in reaching an agreement.

A fifth fact is that many employees testified that they were told at the time of their retirement that their health benefits would be continued until they died and beyond that for their spouses if they elected joint survivorship benefits. The following colloquy between the attorney for the Union and Virgil Grace, a retired Morrell employee, during the trial of this matter illustrates what Morrell supervisors told employees about their retiree health benefits:

Q. (By Mr. King) Go ahead. What else was said?

A. And I decided to take it all and [Bob Worcamp] explained to me that, "Do you know what you are doing?" And I says, "I hope that I do; I think that I do." And I asked for what I was going to get in fringe benefits. He handed me a piece of paper and says, "Read that on the back." And it said that if I took it all, my wife wouldn't get anything and she would lose all of her insurance plus the PCS if I passed away. And if I took partial—part of it she would get those for the rest of her life if I passed away.

Q. She would get what for the rest of her life?

A. The insurance, health benefits, and the PCS. And I said that—after I read it, and it said that I would get my insurance and PCS for the rest of my life, I said that I questioned that and wanted to be sure that I knew what I was getting because in our condition—she has had rheumatoid arthritis for 17 years, and I have arthritis, and we are both in tough shape, and I wanted to be sure and clarify that, that if this—if there was any way that I could lose that health insurance. He said, "The only way you can lose that health insurance is if the company went belly up and went broke." I said I'd just wanted to clarify that be-

cause I believe a person is only as good as their word.

*Id.* at 595–96. Don Sinning, another retired employee of Morrell, stated in his affidavit of April 21, 1992, that "Lavonne Hoffman told us that if I did select a Joint and Survivor form of pension, my wife and I would both be covered by the health benefits during my lifetime and thereafter my wife would be continued to be covered until the end of her life." *Id.* at 1754; *see also* Affidavit of Ronald Christianson (Apr. 21, 1992), *id.* at 1758. Not a single witness for Morrell testified that retirees were told at the time of retirement that Morrell could terminate their health benefits at the expiration of a collective bargaining agreement.

Lavonne Hoffman, the Assistant Manager of Benefits for Morrell in Sioux Falls, South Dakota, submitted an affidavit in which she stated that "it was our standard practice to advise [retirees] that their pensions were guaranteed and fixed, but their [health] benefits were not." *Id.* at 1723. Hoffman did not state that she explicitly advised employees that Morrell reserved the right to terminate the retiree health benefits after retirement. Morrell did not call a single retiree to support Hoffman's statement that retiree health benefits were not guaranteed, nor did Hoffman herself identify any retiree whom she told that health benefits were not guaranteed.

In sum, the record supports the view that both the Union and Morrell intended that health benefits would vest when an employee retired. The retirees knew that health benefits could be modified by Morrell and the Union, but they also knew that it was an article of faith with the Union that the health benefits of retirees would be protected.

Faced with hard times in the intensely competitive meat industry, Morrell's position began to change in 1984. On December 19, 1985, Morrell stated in a letter to a retiree that "benefits are subject to change." *Id.* at 1180. Enclosed with the letter was a summary of retiree health benefits that stated, "This Benefit Program is subject to modification and termination in accordance with applicable law." *Id.* at 1182. Note that Morrell does not explicitly claim that it has the unilateral right to change retiree health benefits. In fact, Morrell was obligated by contract not to do so.

On November 16, 1989, Morrell wrote all retirees a self-serving letter in which it stated that "as always the Company reserves the right to change health care benefits from time to time." *Id.* at 1251. This letter was followed by others in a similar vein in which Morrell's position hardened, culminating in its decision on December 7, 1991, to continue coverage for all retirees but largely at the retirees' expense.

In the face of this history of collective bargaining and representations to individual retirees, I am unable to find any support in the record for the majority's view that the history of collective bargaining indicates that retiree health benefits could be terminated by Morrell unilaterally. Obviously Morrell retained the right to deny health benefits to future retirees, but it did not have the right to terminate the health benefits of already retired hourly employees.

### The Master Agreement Provisions

I cannot agree with the majority that the Master Agreements contain many provisions that reflect an intent to confer only nonvested retiree health benefits. To the contrary, the agreements failed to include a single provision that informed the Union, the active employees, or the retirees that the four-decade practice of providing health benefits could be discontinued at the end of any collective bargaining agreement.

In my opinion, there are two reasons Morrell never told the interested parties that it retained the right to terminate retiree health benefits at the end of a collective bargaining agreement. First, Morrell knew that it had no right to do so, and only asserted this purported right when conditions in the industry became difficult. Second, Morrell knew that its assertion of such a right after more than forty years of give-and-take bargaining involving this issue would certainly trigger a work stoppage. Morrell had a perfect opportunity to assert the right to unilaterally terminate health benefits for retirees in 1971 when *Pittsburgh Plate Glass* was decided by

the Supreme Court. It failed to do so and instead continued to bargain with the Union with respect to retiree health benefits and to honor retirees' health benefit claims without interruption.

The majority next claims that this court held in *Anderson v. Alpha Portland* that language similar to that used here limited retiree health benefits to the duration of the Master Agreement and that such language is inconsistent with an intent to vest retiree health benefits. There are at least two responses to this claim. First, the language here is identical to that in *Dubuque Packing,* in which our court held that contract language plus a course of dealing indicated an intent that the right to health benefits vest upon retirement. We stated:

> While the agreements are not unambiguous, we believe plaintiffs have carried their burden of proof. As noted previously, there are many indications in the agreements and course of dealing that the parties intended the right to benefits would vest upon retirement. The right to receive health and welfare benefits arises from the retiree's status as a past employee. It is not dependent on a continued or current relationship with the Company. The status of a retiree cannot be affected by future negotiations or agreements between the Company and the Union; neither can act on behalf of retirees. There is simply no evidence that the Company and the Union did not intend to vest the right to benefits in the retirees. There is, on the other hand, evidence that the parties implicitly intended to provide lifetime benefits to retirees.

*Dubuque Packing,* 756 F.2d at 70. This panel has no right to overrule *Dubuque*

*Packing;* only this court en banc can take that action.[1]

Second, the facts in *Anderson v. Alpha Portland* are clearly distinguishable from our case.

1. In *Anderson v. Alpha Portland* both the union and the company testified that retiree health benefits were not guaranteed beyond the life of the current collective bargaining agreement. The International Union president, Thomas Miechur, and Alpha Portland personnel manager, Robert J. Bonstein, "testified that under the language they prepared and agreed upon, retiree welfare benefits were not guaranteed beyond the expiration of the CBA." *Anderson v. Alpha Portland,* 836 F.2d at 1515. Here the Union has always taken the position that retiree health benefits are guaranteed for life, and Morrell acceded to that position for many years.

2. Alpha Portland *unilaterally* created a group insurance plan for active employees in 1946 and extended the plan to retirees in 1948. Here Morrell and the Union *negotiated* the health plan for both active and retired employees.

3. Beginning in 1955 the terms of the Alpha Portland plan became subject to bargaining between the company and the union. The booklet describing the initial negotiated plan stated that Alpha Portland reserved the right to *discontinue* the plan. No such language appeared in Morrell's booklet until 1985.

4. In 1965 the union submitted a proposal to Alpha Portland that retiree benefits be paid to a retiree's spouse after the retiree's death, but Alpha Portland rejected it. Here, spouses of Morrell retirees who elected the

---

1. Dubuque Packing Co. made the same argument to this court as is being made by Morrell.

> Plaintiffs' analysis of selected portions of contractual language simplistically and, at times, fancifully, suggests that the parties clearly intended to provide retiree health benefits beyond the terms of the relevant collective bargaining agreements. The retiree benefit provisions of the subject agreements quite simply contain coverage and eligibility provisions which are applicable during the contract term. Due to the absence of language specifying that such benefits shall survive the contract term,

they are subject to the general durational provisions of the agreement. Plaintiffs fail to suggest why parties who are manifestly capable of clearly indicating their intention with respect to the termination of rights and obligations were unable to specify that rights shall not terminate with the agreement in the context of retiree welfare benefits. Instead, Plaintiffs would have this Court believe that the contract provisions specifically describing the *coverage* of these welfare benefits also prescribes their duration.

Dubuque Packing Co. Reply Br. 4–5.

joint option received health benefits until they died or remarried.

5. In *Alpha Portland* benefits for both strikers and retirees continued during the strike. This court stated, "The fact that Alpha treated retirees and striking employees equally negates any inference of intent to vest retiree benefits." 836 F.2d at 1518 n. 3. In contrast, when strikes occurred at Morrell, the health benefits of striking employees were discontinued but health benefits for retirees continued.

The majority makes two additional arguments. First, it states that the durational clause limits all benefits to the life of the collective bargaining agreement. This argument was considered and rejected in *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). In *Yard–Man* the collective bargaining agreement provided that active employees' benefits terminated one month after an employee's layoff. Thus, the benefits of all active employees terminated on plant closure. The company argued that retirees' benefits could thus be terminated at plant closure or with the expiration of the collective bargaining agreement. The court looked to the conduct of the company in determining what the parties intended. It noted that Yard–Man had continued retirees' insurance benefits for a time after plant closure beyond the point where such benefits could have been terminated for active employees. It stated that this conduct indicates that the company "did not consider retiree benefits to be tied to the durational limitations of that active group." *Id.* at 1481. The court went on to say:

> Benefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations. The

employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. If they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements. Contrary to Yard–Man's assertions, the finding of an intent to create interminable rights to retiree insurance benefits in the absence of explicit language, is not, in any discernible way, inconsistent with federal labor law.

*Id.* at 1482 (citations omitted). Here, retiree health benefits were continued during strikes while active employees' health benefits were not.

Second, the majority asserts that "the fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested." [2] While I agree that later modifications *may* be evidence of an intent not to vest, I believe that the evidence of intent in this case is overwhelmingly to the contrary. Most of the changes in benefits were favorable to the retirees or were made to coordinate benefits with newly enacted Medicare. The mere fact that there were subsequent negotiated modifications to retiree health benefits does not prove that such benefits did not vest at the level in effect when the employee retired. Rather, all it indicates is that retirees did not necessarily have any incentive to object to modifications of their benefits if the changes increased their benefits or if the changes were otherwise viewed as beneficial because they contributed to Morrell's long-term prosperity.

During the forty-plus years of negotiations between Morrell and the Union not a single retiree objected to the changes that had been negotiated by Morrell and the Union. If an individual retiree believed that his vested right to health benefits had been diminished, that retiree had a right to commence an

---

**2.** In III.3., the majority states that Morrell's unilateral "adoption of a modified health benefits package for past retirees with the signing of each master agreement" is evidence that prior benefits were not vested. In fact, Morrell did not unilaterally adopt a modified health benefit package for past retirees with the signing of each new master agreement. In every case until the very end, the benefits package for retirees was negotiated by Morrell and the Union.

action under section 301 of the Labor Management Relations Act to assert his right to receive the benefits that existed at the time of his retirement.[3] Benard J. Aning, a retired employee of Morrell, personally and as a representative of the defendant class, is a party to this action. Prior to this action, no retiree had commenced an action to challenge any of the negotiated changes to the retiree health plan.

### Conclusion

For four decades Morrell and the Union negotiated retirees' health benefits. In 1991, for economic and competitive reasons, Morrell decided to charge retirees for health benefits. Were it not for its bargain with the Union to continue to provide health benefits to retirees, it would have a right under ERISA to make that change. Morrell certainly had the right to make this decision with respect to future retirees, but not with respect to employees who had already retired. Morrell made the bargain, and no court may refuse to enforce this bargain, which was entered into freely and which cost active employees higher wages and better working conditions, which they agreed to because they were concerned about hospital and medical bills for themselves and their spouses after they retired.

I dissent not because I feel sympathy for the retirees, although I do, and not because I question that the meat packing industry is an intensely competitive one, but simply because a bargain is a bargain, and we should not absolve either party from their bargain. I would reverse the judgment of the district court.

---

3. The Court in *Pittsburgh Plate Glass* stated:
   This does not mean that when a union bargains for retirees—which nothing in this opinion precludes if the employer agrees—the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed.
   404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20 (citations omitted).