# United States Court of Appeals

## For the Eighth Circuit

———————————————

No. 13-1723

———————————————

Windstream Corporation; Windstream Benefits Committee; Windstream Systems of the Midwest Inc.; Valor Telecommunications of Texas LP, doing business as Windstream Communications Southwest

*Plaintiffs - Appellees*

v.

Lido Da Gragnano; Forrest Bainbridge; Craig Wallace; Byron Spainhour; Jack Kiser; Patrick Andrews; Mario Mascioni; John Stolte; Rose Cardinale; Betty M. Bassinger; Edward J. Buzonas, Sr.; Anita J. Starkey

*Defendants*

Johnny Lee, Individually and as Representative of Persons Similarly Situated

*Defendant - Appellant*

Jack E. Bruns; Armando T. Rodriguez; David C. Strom; Mary E. Winters; Raymond E. Wieland; Helen E. Franks; Homer A. Meekins; Arlene Crouch-Hill; Jean L. Randall; Pauline Y. Robinson; Helen M. Hale; Danny Ammons; Thomas Weldon Case; Careatha A. Adams; Floyd L. Madison; Dorene R. Fuller; Donald H. Rempe; Carmen M. Bryant; Sarah McMullen; Linda Sue Donahue; Donald F. Antholz; Charles J. Moore; Joseph P. Wansolich; Thomas Farrell Watts; Agnes M. Davis; John W. Haak; Jack R. Elliot; Tyrone M. Kimrey; Dan Weinheimer

*Defendants*

Communications Workers of America, AFL-CIO

*Cross Claimant - Appellant*

Valor Telecommunications of Texas LP, doing business as Windstream
Communications Southwest

*Cross Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 16, 2014
Filed: July 8, 2014 (Corrected July 8, 2014)

_____

Before LOKEN and MURPHY, Circuit Judges, and LIMBAUGH,[1] District Judge.

_____

MURPHY, Circuit Judge

In 2009 Windstream Communications modified the premium subsidy it paid to former employees enrolled in its medical benefits plan for retirees. The company filed this action in November 2009 against Johnny Lee and other retirees who challenged company authority to modify retiree benefits unilaterally. Windstream sought a declaratory judgment that it has the authority to modify retiree benefit premium contributions without violating either a collective bargaining agreement with the Communications Workers of America (CWA) or the Employee Retirement Income Security Act (ERISA). Lee was the only retiree to answer Windstream's complaint, and the CWA later intervened with a breach of contract claim against Windstream under § 301 of the Labor Relations Management Act (LMRA). Windstream filed a motion in January 2013 for summary judgment on all claims. The district court[2]

_____

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

granted Windstream's motion and requested a declaratory judgment. It further dismissed the CWA's suit for failure to state a claim. Lee and the CWA appeal, and we affirm.

## I.

Before its acquisition by Windstream Communications, Valor Telecommunications negotiated a series of three year collective bargaining agreements with the CWA. Separate memoranda of agreement (MOA) on retiree health benefits were attached to each bargaining agreement. In 2005 the company and union agreed in an MOA, "to provide retiree medical benefits for eligible employees who retire between March 1, 2005 and February 28, 2008 . . . and their beneficiaries."

The first paragraph of the 2005 MOA states that "the level and type of Retiree Medical Benefits . . . shall be governed by the Valor Retire Health and Welfare Summary Plan Description." Paragraph 2 states that Valor

> will pay a percentage/amount of the [retiree medical benefit] premium ("Company Contribution Percentage/Amount") . . . During the term of this Memorandum of Agreement, the Company and retiree Contribution Percentages/Amount will be based on the following contribution schedule:

| Years of Accredited Service at Retirement | Company Contribution Percentage | Retiree Contribution Percentage/Amount |
|---|---|---|
| Less than 10 | 0 | 100 |
| 10 through 14 | 20 | 80 |
| 15 through 19 | 40 | 60 |
| 20 through 24 | 60 | 40 |
| 25 through 29 | 80 | 20 |
| 30 and over | 90 | 10 |

The Valor plan description contains a reproduction of the company contribution schedule. It also states that it is "maintained pursuant to the collective bargaining agreement" with the CWA and that "the collective bargaining agreement will control" where the two conflict. Another provision declares that the company "reserves the right to terminate, amend, or replace the Valor Telecommunications Plan, in whole or in part, any time for any reason."

Johnny Lee worked for Valor and its predecessors for twenty eight years and was a member of the CWA collective bargaining unit. When Lee retired in March 2006, he enrolled in the Valor retiree health plan under the terms of the 2005 MOA. Because of his more than twenty five, but less than thirty, years of accredited service to the company, Valor paid 80% of Lee's retiree health benefit premium. Lee's out of pocket cost for his and his wife's medical coverage was $125 to $140 per month. Even though the 2005 MOA under which he retired expired on February 28, 2008, Valor continued Lee's benefits and subsidies beyond that date. Valor also continued the retiree health benefits of other employees beyond the expiration dates of the MOAs under which they retired.

Valor was acquired by Windstream Communications in 2006, and its name was changed to Windstream Communications Southwest. Windstream maintains a comprehensive plan of group insurance. Sections 9.01 and 10.01 of the Windstream comprehensive plan secure the right of the Windstream board of directors to "amend this Plan in whole or in part at any time and for any reason" and to "terminate this Plan at any time."

Windstream informed the CWA in 2008 of its interest in changing its retiree premium contribution to a flat $80 per month for retirees under age 65 and $17 per month for retirees aged 65 and older. The company abandoned the modification when the CWA indicated it would not agree to it, and the parties instead agreed to carry over

the graduated contribution schedule from the 2005 MOA to the 2008 MOA. They did however add the following paragraph not found in the 2005 MOA:

> The Company agrees to notify the Union and to discuss its actions should the Company determine that the funding or operation of the plan and/or applicable sections of this Memorandum of Agreement, need to be modified or rescinded prior to the expiration of the Articles of Agreement . . . If the parties are unable to reach agreement on such changes, the funding and operation of the plan and/or applicable sections of this Memorandum of Agreement, those sections relating to the level and type of Retiree Medical Benefits will be modified or rescinded at the Company's discretion.

Although the 2005 MOA did not include this paragraph, it had been a part of MOAs negotiated in 1992, 1995, and 1998. The 2008 MOA limited eligibility for benefits to employees who retired between February 29, 2008 and February 28, 2011.

Sometime in 2009 Windstream notified the CWA that changed economic circumstances required modification of its premium contributions. The parties held negotiations but failed to agree on a modification. The Windstream board of directors then voted in November to reduce retiree benefit contributions to the flat rates proposed and rejected in 2008 and to discontinue subsidies for retiree spouses and dependants. Lee and several other retired Valor employees objected to the change, disputing Windstream's right to modify retiree health and welfare benefits without their consent.

In December 2009 Windstream filed this class action in federal district court against Lee and other objecting retirees, seeking a declaratory judgment that it had a right to amend retiree health benefits unilaterally and that the modification of its contribution schedule did not violate ERISA or the collective bargaining agreement. Lee was the only class defendant to answer the complaint. The modification became effective on July 1, 2010, and Windstream's contribution to Lee's retiree health

benefits dropped from between $625 and $700 per month to $80 per month. No longer able to retain medical coverage under the reduced subsidy, Lee obtained a part time job so he could afford the $500 to $550 per month he now pays for health insurance. His wife has been unable to replace her lost coverage.

The CWA intervened in May 2011, suing Windstream for breach of contract under § 301 of LMRA. Windstream filed this motion in January 2013 for summary judgment against each of the class defendants and the CWA. The company asked the district court to declare that (1) the modifications it made to the contribution schedule were legally effective and enforceable, (2) the modifications did not violate ERISA, the Windstream Plan, or the CWA collective bargaining agreement, and (3) it has the right to amend, modify, or terminate the plan or any of its provisions unilaterally.

The district court determined that the Windstream comprehensive plan, the Valor summary plan description, and the 2005 and 2008 collective bargaining agreements along with their attached MOAs together formed the ERISA plan documents. The court then concluded that each of these documents contained reservation of rights clauses securing the company's right to modify the retiree health benefits plan, including its contribution amounts, unilaterally. It accordingly granted Windstream's motion in February 2013, declaring the company's right to modify its contribution unilaterally without violating ERISA or the bargaining agreement, entering default judgment against the nonresponsive defendants, and dismissing the CWA's cross suit for failure to state a claim. Lee appeals the district court's grant of summary and declaratory judgment to Windstream, and the CWA appeals the dismissal of its breach of contract claim.

II.

We review the grant of summary judgment de novo, viewing all facts and drawing all reasonable inferences in favor of the nonmoving party. Argenyi v.

Creighton Univ., 703 F.3d 441, 446 (8th Cir. 2013). Construction of an unambiguous contract is "a question of law appropriate for summary judgment," McCormack v. Citibank, N.A., 100 F.3d 532, 538 (8th Cir. 1996). However, construction of an ambiguous contract is a factual question precluding summary judgment "unless extrinsic evidence is conclusive." Thomsen v. Famous Dave's of Am., Inc., 606 F.3d 905, 911 (8th Cir. 2011).

Lee and the CWA assert that the text and negotiating history of the 2005 MOA create a factual question that company retiree benefit contributions were promised for the lifetime of the retirees and could not be unilaterally modified by the company. Section 301 of LMRA provides a remedy for retirees whose employers have modified vested retirement rights without their consent. Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div., 404 U.S. 157, 182 (1971). Unions also have an enforceable interest under §301 "in assuring that negotiated retirement benefits are in fact paid and administered in accordance with the terms and intent of their contracts." Id. at 176 n.1. Under ERISA, an employer may unilaterally modify or terminate retiree health and other welfare benefits unless they have been vested. Id. at 182. Retiree health and welfare benefits are not vested unless the employer has "contracted an agreement to the contrary." Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002). The burden is on the retiree or union to prove "vesting languages exists" in the plan documents. Crown Cork & Seal Co., Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, 501 F.3d 912, 919 (8th Cir. 2007). Vesting promises may be found in a collective bargaining agreement if they are "incorporated . . . into the formal written ERISA plan." United Paperworkers Int'l Union, AFL-CIO, CLC v. Jefferson Smurfit Corp., 961 F.2d 1384, 1386 (8th Cir. 1992).

The district court correctly determined that the Windstream comprehensive plan, the Valor plan description, and the 2005 and 2008 MOAs comprised the ERISA plan documents here. Because of "the importance of disclosure to the ERISA

statutory regime," we have determined that an "employee can be expected to rely on the summary plan description." Jobe v. Medical Life Ins. Co., 598 F.3d 478, 483 (8th Cir. 2010) (internal quotation marks and brackets omitted). When examining a collective bargaining agreement for retiree benefit promises, we look to the agreement in effect at the time the employee retired. Crown Cork, 501 F.3d at 915–16. Because the Valor plan description states that it is maintained pursuant ot the bargaining agreement, we look to the language of the 2005 MOA for a contractual promise to provide vested retiree health benefits.

To obtain a reversal of the district court judgment, Lee must demonstrate that the plan language, when viewed in the light of relevant extrinsic evidence, is "reasonably susceptible" to his claim that the company agreed to vest retiree benefits permanently. See John Morrell & Co. v. Local Union 304A of United Food and Commercial Workers, AFL-CIO, 913 F.2d 544, 551 (8th Cir. 1990) ("John Morrell I"). 551. When interpreting an ERISA plan, we first look for the intent of the parties "by careful examination of the clause in question, giving the words in that clause their ordinary meaning." Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 877 (8th Cir. 2009). We examine the rest of the plan instrument only "[i]f the construction question cannot be resolved by reference to the clause alone." Id. Extrinsic evidence may be considered if "the intent or meaning of the [parties] . . . cannot be determined by reference to . . . the instrument." Id. at 877–88.

The only vesting language Lee points to in the plan documents here is the word "will" before the words "pay a percentage/amount of the premium" in the 2005 MOA. Lee and the CWA assert that this word shows that the company intended to provide the retiree benefit subsidy for the lifetimes of the retirees. When placed in front of a verb like "pay," the word "will" indicates "simple futurity," "likelihood or certainty," "requirement or command," "intention," "customary or habitual action," "capacity or ability," and "probability or expectation." Webster's II New College Dictionary 1293 (3d ed. 2005). None of these definitions promise that the verb will be performed

permanently. Actions that are likely, certain, required, commanded, customary, or habitual may be expected one day to end.

Lee and the CWA argue that the parties' negotiating history demonstrates their intent that retiree health benefits be vested. When a collective bargaining provides ERISA welfare benefits, an intent to vest the benefits may be "derived from ambiguous language . . . construed in light of the parties' lengthy bargaining history." John Morrell & Co. v. United Food and Commercial Workers Int'l Union, AFL-CIO, 37 F.3d 1302, 1304 (8th Cir. 1994) (John Morrell II). The burden of proving such intent is "difficult, though not impossible." Id. Bargaining history includes proposed or requested provisions that were adopted, amended, or rejected. See e.g., id.; Towers Hotel Corp. v. Rimmel, 871 F.2d 766, 771–72 (8th Cir. 1989); Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. (UAW) v. White Motor Corp., 505 F.2d 1193 (8th Cir. 1974).

The parties excluded from the 2005 MOA a paragraph found in prior agreements which authorized the company to modify "applicable sections of this Memorandum of Agreement . . . relating to the level and type of Retiree Medical Benefits" after first notifying the union and seeking its agreement. When Windstream decided it needed to change its contribution amounts, it first sought the CWA's agreement. When the union rejected its proposal, Windstream abandoned it, opting instead to bargain successfully for the paragraph to be added to the 2008 MOA. When the 2008 MOA became effective, the company again sought union agreement to a modification. This time when the parties failed to agree, Windstream modified its contribution amounts unilaterally.

Although Windstream's conduct indicates it understood the 2005 MOA not to allow it to modify its contribution amounts without the CWA's consent, there is no evidence indicating it was required to obtain retiree consent, as well. As the Supreme Court ruled in Allied Chemical vested retiree benefits cannot be changed without

retiree consent, and retirees are not members of a union's bargaining unit. 404 U.S. at 173. If under the 2005 MOA the company and union could bilaterally agree to modify the company contribution amount without Lee's consent, then his right to it could not have been permanently vested.

Lee and the CWA finally argue that Windstream's decision to continue Lee's benefits beyond the terms of the 2005 agreement is evidence that they were vested. It is well settled that a "'clause expressly limiting the duration of the retirement health benefits . . . to the duration of the Master Agreement . . . [is] inconsistent with an intent to vest health benefits for life.'" Crown Cork, 501 F.3d at 917 (quoting John Morrell II, 37 F.3d at 1307). Nevertheless, the continuation of retiree benefits beyond the term of a durational clause in a contract may be evidence that the company "implicitly intended to provide lifetime benefits to retirees. See Local Union No. 150-A, United Food & Commercial Works Int'l Union, AFL-CIO, CLC v. Dubuque Packing Co., 756 F.2d 66, 70 (8th Cir. 1985). This case is distinguishable from Dubuque Packing, however, because in that case there was "credible evidence in the record that past employees were advised they would receive lifetime benefits." Id. at 69. There is no evidence here that Valor gave its employees the same assurance.

## III.

We conclude that even when read in the light of its negotiating history, the 2005 MOA is not "reasonably susceptible of the meaning" that Lee's retiree health benefits were permanently vested. John Morrell I, 913 F.2d at 551. We accordingly affirm the district court judgment in favor of Windstream.

LOKEN, Circuit Judge, concurring, with whom LIMBAUGH, District Judge, joins.

I agree that appellants Johnny Lee and the Union failed to submit extrinsic evidence demonstrating that ERISA plan documents, including the MOAs, evidenced

an intent to permanently vest retiree health benefits at the levels in place when a member of the bargaining unit such as Lee retired. However, in my view, we need not reach this issue. Because ERISA does not mandate vested employee welfare plan benefits, "unless an employer has contractually agreed to provide vested retiree health benefits, it may unilaterally modify or terminate the benefits at any time." Maytag Corp. v. Int'l Union, UAW, 687 F.3d 1076, 1084 (8th Cir. 2012). "[T]here must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation-of-rights" in the plan; otherwise, that provision "is sufficient without more to defeat a claim that retirement welfare plan benefits are vested." Stearns v. NCR Corp., 297 F.3d 706, 712 (8th Cir. 2002), cert. denied, 537 U.S. 1160 (2003). Thus, when ERISA welfare benefits are provided in a collectively bargained plan that is "devoid of vesting language . . . . extrinsic evidence *may not be considered*." Maytag, 687 F.3d at 1086 (emphasis in the original; citation omitted).

Here, the summary plan description stated that the company "reserves the right to terminate, amend, or replace the . . . Plan, in whole or in part, at any time for any reason." Although a conflicting provision in the collective bargaining agreement would control, Paragraph 6 of every MOA in the record on appeal provided:

> The level and administration of the Retiree Medical Benefits; amount or cost of premiums; premium pricing mechanisms; the attainment of the Maximum Company Contribution Amount . . . [and] all terms and conditions related hereto . . . shall rest with the Company . . . .

Together, these provisions resolve the issue. There is no affirmative indication of vesting in any plan document, including the 2005 and 2008 MOAs. Paragraph 8 that was added to the 2008 MOA (quoted at page 5, *ante*) was similar to provisions in the 1992, 1995, and 1998 MOAs, but with one critical difference. Those earlier provisions *excluded* from the company's agreement to notify the Union and discuss the need for unilateral changes, "those sections relating to the level and type of Retiree Medical Benefits." The changing scope of this provision, when read in conjunction

-11-

with Paragraph 6, confirms that the company in these "notify-and-confer" provisions was simply agreeing to bargain specific issues of importance to the Union, before exercising its reserved right to make unilateral changes. This is the opposite of an affirmative indication of vesting. In these circumstances, extrinsic evidence may not be considered.

In opposing summary judgment, Lee and the Union presented no affirmative contractual evidence that retiree medical benefits were vested, only evidence that retiree benefits were the subject of periodic collective bargaining. Our prior cases required far more to defeat Windstream's motion for summary judgment and entry of the declaratory judgment it requested.

_____