James W. McPEEK, Louis Bock, Fred Alberts, Marjorie Amick, Martin Becker, Patricia Bennett, Frances Benson, Lucille Birch, Alfred Bose, Harold Bristol, Milton Bristol, Leonard Brown, Jack Brummond, John Bulzak, Manuel Coury, Josie Dais, Elmer Devries, Ceroga Dorashkevich, Darrell Elkins, Harold Frerichs, Leatha Graves, Aurelia Groth, Harold Guthmiller, Carl Guy, Louis Hebert, Ted Isom, Frank Jerman, Harlan Jones, Gerald Krause, Stanley Lake, Charles Lucas, Anton Leubken, Clar-

ance Woods, John Michalsky, Robert Netley, Darrell Omara, Vera Powell, Soccorra Rol, August Treft, Marie Vaa, Louise Verschoor, Hollas Watkins, Kenneth Williams, Charles L. Larson, and John Holincheck, Plaintiffs,

v.

BEATRICE COMPANY, Defendant.

No. C 92–4017–MWB.

United States District Court,
N.D. Iowa,
Western Division.

July 30, 1996.

Patricia K. Wengert of Smith, McElwain & Wengert, Sioux City, Iowa, for Plaintiffs.

Roger J. Miller of McRath, North, Mullin & Kratz, P.C., Omaha, Nebraska, and Jeffrey R. Mohrhauser of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, Iowa, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND.....................................621

II. FINDINGS OF FACT................................................621

Ill. STANDARDS FOR SUMMARY JUDGMENT ..............................624

IV. CONCLUSIONS OF LAW............................................626
    A.   Background on ERISA ........................................626

B.  Vesting of Benefits ............................................. 627
    1.  Coverage Under the Plan ....................................... 628
    2.  Vesting of Prescription Drug Benefits ................................ 629
C.  Claim Under the Labor Management Relations Act ......................... 631

V.  CONCLUSION ................................................ 632

BENNETT, District Judge.

In an action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, Plaintiffs, beneficiaries under an employee benefit and pension plan ("The Plan"), challenge changes made to the Plan which require them to obtain maintenance level supplies of prescription drugs through a mail order service. Although Plaintiffs characterize this case as merely being the simple enforcement of the principle that "a deal is a deal is a deal," such a characterization assumes the threshold issue of the existence of a "deal" which might be enforced under the rubric of ERISA. Thus, before enforcement may be had here, the court is called upon to determine what "deal" existed under ERISA.

## I. INTRODUCTION AND BACKGROUND

Plaintiffs, all former union members and beneficiaries under the Plan, filed their complaint against Defendant Beatrice Company ("Beatrice") on April 2, 1992, following Beatrice's decision to switch to a mail-order service for maintenance prescription drugs for its retirees. Plaintiffs challenge the switch to mail-order maintenance drugs. In count I of the original complaint, Plaintiffs allege that Beatrice's actions constitute an unauthorized modification of the Plan in violation of ERISA, 29 U.S.C. §§ 1132(a)(1), 1104, and 1109. Count II of the original complaint asserted a claim that Beatrice's actions constitute a breach of the collective bargaining contracts in violation of the Labor Management Relations Act, 29 U.S.C. § 185(a). On November 25, 1994, Plaintiffs amended the complaint to add a number of individual plaintiffs to this action. Subsequently, on May 23, 1995, Plaintiffs amended their complaint again. In their second amended complaint Plaintiffs allege that Beatrice has violated Iowa Code section 514C.5 by requiring Plaintiffs to employ a mail order system for obtaining maintenance prescription drugs. On October 16, 1995, the court granted Defendant Beatrice's Motion for Partial Summary Judgment and Motion to Dismiss. The court concluded that ERISA preempted Plaintiffs' state law claim based on a violation of Iowa Code section 514C.5. The court further concluded that the extra-contractual damages for emotional distress damages sought by Plaintiffs under ERISA were not appropriate equitable relief authorized under ERISA. Therefore, Beatrice's motion to dismiss Plaintiffs' claims for emotional distress under ERISA was granted.

Beatrice has now moved for summary judgement on Plaintiffs' remaining claims. Beatrice makes four distinct arguments in its motion. First, Beatrice asserts that Plaintiffs do not have a contractually vested right to receive benefits under the Plan. Second, Beatrice contends that the mail order service program that it has implemented for maintenance level medications is consistent with the terms of the Plan. Third, Beatrice asserts that it is entitled to summary judgment on Plaintiffs' LMRA claim since it was not a party to the Union contract. Finally, Beatrice asserts that it is entitled to summary judgment on Plaintiffs' request for actual damages.

A hearing on Beatrice's Motion for Summary Judgment was held on July 26, 1996. At the hearing Plaintiffs were represented by Patricia K. Wengert of Smith, McElwain & Wengert, Sioux City, Iowa. Beatrice was represented by Roger J. Miller of McRath, North, Mullin & Kratz, P.C., Omaha, Nebraska, and Jeffrey R. Mohrhauser of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, Iowa. This matter is now deemed fully submitted.

## II. FINDINGS OF FACT

For the purposes of this summary judgment motion only, the court finds the following facts:

Plaintiffs are retirees of Swift & Company ("Swift") who retired prior to January 1, 1979. Plaintiffs were employed at Swift's meat packing facility in Sioux City, Iowa, and were union members covered by selective bargaining agreements between Swift and the Amalgamated Meat Cutters and Butcher Workmen of North America or the United Food and Commercial Workers International Union ("the Union"). Defendant Beatrice maintains and administers certain self-funded benefit plans for retirees of Esmark, Inc. ("Esmark"), and its subsidiary, Swift.

Esmark was acquired by Beatrice in 1984. The Plan at issue here was first formulated and made available to Swift employees during the 1976–79 Swift & Company Master Agreement with Amalgamated Meat Cutters and Butcher Workmen of North America ("The 1976–79 Master Agreement").[1] Under the 1976–79 Master Agreement, the Plan provides for participants to receive a prescription drug card which enables participants to obtain covered drugs.[2] The Plan incorporates by reference the coordination of benefits provision contained in the Hospital, Surgical, Medical, Polio Plan for employees, as set forth in the Exhibit III of the 1976–79 Master Agreement. *See* 1976–79 Master Agreement at 130. The Plan does not prohibit the utilization of mail order services for the attainment of covered prescription drugs. The Plan does not specify or prohibit the manner by which participants obtain covered prescription drugs. The Plan excludes payment for prescriptions of more than thirty-four days or one hundred units. As it existed under the 1976–79 Master Agreement, the Plan was not available to retirees.

The Plan was continued in the 1979–82 Swift & Company Master Agreement with Amalgamated Meat Cutters and Butcher Workmen of North America ("The 1979–82 Master Agreement").[3] The Plan was extended in the 1979–82 Master Agreement to include employees who retired after August 31, 1979. Retirees under the Plan, however, are required to pay a deductible of $1.75 per prescription or refill.[4] The Plan continued to exclude payment for prescriptions of more than thirty-four days or one hundred units.[5] The Plan does not have any specific permanent prohibition on refills of covered prescription drugs. Drugs prescribed in quantities greater than a thirty-four day supply or one hundred doses are considered to be "maintenance drugs."[6]

The 1979–82 Master Agreement included a clause limiting its duration:

*Except as otherwise provided, all of the provisions of this Agreement shall take effect as of September 1, 1979, and shall*

---

1. Excerpts of the 1976–79 Master Agreement is Beatrice's Exhibit 7.

2. The 1976–79 Master Agreement provided for the following claims procedure:

    The Company shall provide benefits through a "credit card" system whereby employees may purchase covered drugs through a "participating pharmacy" by payment of the $1.00 deductible per prescription or refill. Drugs purchased through a "non-participating pharmacy" will require payment by the employe and the filing by him of a claim for reimbursement for the reasonable and customary cost, less the $1.00 deductible per prescription or refill.
    The 1976–79 Master Agreement at 133.

3. Excerpts of the 1979–82 Master Agreement is Beatrice's Exhibit 7.

4. The provision of the 1979–82 Master Agreement extending the Plan to retirees provides, in pertinent part:

    **K. HOSPITAL MEDICAL–SURGICAL PLAN FOR FUTURE PENSIONERS**

    The Company shall make available at it own expense for each enrolled employee who retires on immediate pension under the ESMARK, INC. Pension Plan for Non–Salaried Employees After August 31, 1979 and for his legal spouse and dependents, if any, at the time of retirement:
    . . . .
    3. The Prescription Drug Card Plan which was available to eligible employees and their dependents on August 31, 1979 modified to provide for a deductible of one dollar and seventy-five cents ($1.75) for each prescription.
    The 1979–82 Master Agreement at 188–89.

5. The Plan provided in pertinent part:

    6. *Exclusions:*
    Prescription drug benefits will not be provided for any charges for:
    . . . .
    8. More than a thirty-four (34) day supply or one hundred (100) unit doses of any covered drug, whichever is greater.

6. The Plan does not employ the term "maintenance drugs."

*remain in effect until September 1, 1982, and from year to year thereafter, provided, however, that this Agreement may be terminated on September 1, 1982, or on September 1, of any year thereafter by either party by written notice mailed to the Company at its general office, or to the Union at its national headquarters at least sixty (60) days prior to September 1, 1982, or prior to September 1 of any year thereafter.*

The 1979–82 Master Agreement at 98.

In October 1979, Esmark retirees received a letter from Esmark notifying them of change in their pension benefits.[7] The letter stated in relevant part:

We are pleased to inform you that Esmark, as a matter of company policy, and with the agreement of the United Food and Commercial Workers International Union AFL–CIO, has been extended the following increased medical benefits, effective September 1, 1979:

1. Medicare B reimbursement will be increased from $7.20 per month to $8.70 per month for those pensioners and their spouses who are eligible for such coverage.

2. The company will issue a prescription drug card to each pensioner which will specify a flat deductible amount of $1.75 for each prescription. Further details will be supplied when the cards are issued. After the cards are issued, prescription drugs will no longer be part of your Major Medical coverage.

October 1979, letter from Esmark at 1.[8]

Prior to 1979, prescription drug benefits were available to retirees only through the Major Medical Plan for Pensioners. The Major Medical Plan for Pensioners was included in the 1976–79 Master Agreement as Exhibit VIII(P), and it provided in relevant part:

### HOSPITAL–MEDICAL–SURGICAL PLAN FOR PENSIONERS

The Company shall make available at its own expense for each enrolled employe who retires on immediate pension under the ESMARK, INC. Pension Plan for Non–Salaried Employees after March 31, 1967, and for his legal spouse, if any, at the time of retirement:

. . . .

2. Coverage in accordance with and at the same level as, the ESMARK, INC. MAJOR MEDICAL PLAN 2 which was available to eligible employees on August 31, 1976, except that such plan will be modified to:

(a) include prescription drugs as a covered expense not subject to the deductible amount.

The 1976–79 Master Agreement at 196–97.

The Esmark Major Medical Plan 2, for Certain Non–Salaried Employees Retired

---

7. The October 1979 letter from Esmark is part of Plaintiffs' Exhibit J.

8. The retirees subsequently received a follow up letter, also dated October 1979, from Esmark. This letter, Plaintiffs' Exhibit K, states in relevant part:

As we informed you in our previous letter, Esmark is providing prescription drug cards for your use in lieu of the prescription drug coverage provided by the Major Medical Plan. Major Medical prescription drug coverage will terminate November 17, 1979.

This prescription drug program was designed so that you can obtain your prescriptions by the use of a PCS plastic I.D. card. You should always get the best results from the program if you have your prescriptions filled at a PCS Member Pharmacy. These stores are identified by a PCS decal near their front door or in the area of the pharmacy section of the store.

Be sure to present your PCS card to the pharmacist with your prescription each time you need to have a prescription filled or refilled. The only cost to you is the "deductible" or copayment for each prescription filled or refilled ($1.75). This amount is shown in the lower right corner of the plastic I.D. card. Obviously, if the total price of your prescription is less than the deductible, you should pay that amount only.

. . . .

The more important exceptions to the drugs covered by the plan are:

. . . .

—Charges for any prescription refill in excess of the number specified by the physician or any refill dispensed after one (1) year from the order of the physician.

October 1979, follow up letter from Esmark at 1–2.

Prior to 9/1/76, and the Esmark Major Medical Plan 2, for Certain Non–Salaried Employees Retired On or After September 1, 1976 (collectively, "The Major Medical Plan"), are major medical plans referred to in the 1976–79 Master Agreement and the 1979–82 Master Agreement.[9] For those employees who retired prior to September 1, 1976, the Major Medical Plan provided for payment of seventy-five percent of the prescription drug costs and required no deductible amount. For those employees who retired on or after September 1, 1976, the Major Medical Plan provided for payment of eighty percent of the prescription drug costs and required no deductible.

On September 11, 1985, the Sioux City plant from which Plaintiffs retired was closed. No collective bargaining agreement applicable to the Sioux City plant has existed since its closing.

Esmark was acquired by Beatrice. Beatrice in turn was acquired via merger by ConAgra, Inc. in 1990. In September 1991, Beatrice notified retirees that, effective October 1, 1991, retirees would be required to obtain maintenance drugs, prescriptions for more than a thirty-four day supply or one hundred unit dose, through a mail order program.[10]

Under the mail order service, retirees could obtain up to a ninety day supply of maintenance drugs and pay a deductible of

$4.00. To obtain the equivalent amount of drugs from retail pharmacies, with the $1.75 deductible per prescription or refill, would cost retirees $5.25. Plaintiffs have not been required to utilize the mail order service to obtain prescriptions for non-maintenance drugs.

### III. STANDARDS FOR SUMMARY JUDGMENT

■ The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986));

**9.** The Esmark Major Medical Plan 2, for Certain Non–Salaried Employees Retired Prior to 9/1/76 is Beatrice's Exhibit 11, and The Esmark Major Medical Plan 2, for Certain Non–Salaried Employees Retired On or After September 1, 1976 is Beatrice's Exhibit 12.

**10.** The September 1991 letter, Beatrice's Exhibit 13, stated in relevant part:

> Your new Prescription Drug Program, provided by Baxter Healthcare Corporation's Prescription Service Division, is effective October 1, 1991. You (and your eligible dependents, if you have family coverage) will receive top quality drugs and service at a significant saving for both mail service and retail prescription drugs. PCS will no longer be processing your prescription drug claims.
>
> . . . .
>
> Under your new prescription drug program, you may obtain your prescription(s) in one of three methods:

> For your short-term prescriptions of up to a 34–day supply of medication, go to any Network Pharmacy (listed in the enclosed brochure) and pay your regular co-payment. There are two Network Pharmacy I.D. cards in this package. (Please note that these cards will say Con Agra/Beatrice regardless of the company from which you retired). Your PCS card is no longer valid for retail prescriptions under the plan after September 30, 1991.
>
> For prescriptions over a 34–day supply and all maintenance medications, mail your prescriptions and $4.00 copayment to Baxter Mail Service (in the enclosed white envelope). *Please send all prescriptions to Baxter, and not to HCS.* HCS will no longer be processing your mail order prescriptions after September 30, 1991.
>
> If you go to a non-network pharmacy, you must pay full price to the pharmacy and mail your receipt in the enclosed ivory claim form to Baxter for processing.

September 1991 letter at 1.

*Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[11] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Plaintiffs, and give Plaintiffs the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Rifkin v. McDonnell Douglas Corp.,*

78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir. 1996); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party, Beatrice, bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). Beatrice is not required by *Rule 56* to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule 56(c),* its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Plaintiffs are required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104

---

**11.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the non-moving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If Plaintiffs fail to make a sufficient showing of an essential element of a claim with respect to which they have the burden of proof, then Beatrice is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247.

"Summary judgment is particularly appropriate in cases involving the interpretation of contracts." *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 564–65 (7th Cir.1995); *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir.1989). Where the contract is unambiguous, a court must determine the meaning of the contract as a matter of law. *Murphy,* 61 F.3d at 565; *Ryan,* 877 F.2d at 602. With these standards in mind, the court turns to consideration of Beatrice's motion for summary judgment.

## IV. CONCLUSIONS OF LAW

### A. Background on ERISA

On Labor Day 1974, President Ford signed ERISA into law. "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries by regulating the creation and administration of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44, 107 S.Ct. 1549, 1551, 95 L.Ed.2d 39 (1987); *see also Massachusetts Mut. Life Ins. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985); 29 U.S.C. § 1001. "The statute imposes participation, funding, and vesting requirements on pension plans. It also sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) (citations omitted). ERISA recognizes two types of employee benefit plans: pension plans and welfare plans. *In re Unisys Corp. Retiree Medical Ben. ERISA Litigation,* 58 F.3d 896, 901–02 (3d Cir.1995); *Deibler v. Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992).[12] In keeping with ERISA's design to be a comprehensive, uniform federal scheme for regulation of employee benefit plans, ERISA has a broad, expansive preemption clause. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 137, 111 S.Ct. 478, 481, 112 L.Ed.2d 474 (1990). Keeping this general background in mind, the court will now turn to consideration of

---

12. In general, ERISA defines an "employee welfare benefit plan" and "welfare plan" as "any plan, fund or program" established for the purpose of providing "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). In contrast, an "employee pension benefit plan" or "pension plan" means "any plan, fund or program" that provides retirement income or results in deferral of income until the termination of employment. 29 U.S.C. § 1002(2)(A).

the ERISA issues raised by Defendant Beatrice's motion for summary judgment.

### B. Vesting of Benefits

Both parties are in agreement that the Plan at issue in this case constitutes a welfare benefit plan under 29 U.S.C. § 1002(1). The implications of such a classification are significant here for "[i]t is well-established that ERISA does not prohibit a company from terminating or modifying previously offered benefits that are not vested." *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855 (4th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1442, 131 L.Ed.2d 321 (1995); *see also Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 935 (5th Cir.), *cert. denied,* 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993); *Owens v. Storehouse, Inc.*, 984 F.2d 394, 397 (11th Cir.1993). While ERISA contains elaborate vesting requirements for pension plans, ERISA does not require automatic vesting of welfare benefit plans. *See Curtiss–Wright Corp. v. Schoonejongen,* — U.S. ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995); *Massachusetts v. Morash,* 490 U.S. 107, 119, 109 S.Ct. 1668, 1675, 104 L.Ed.2d 98 (1989); *Keystone,* 61 F.3d at 564; *In. re Unisys Corp. Retiree Medical Ben. ERISA Litigation,* 58 F.3d at 901; *Gable,* 35 F.3d at 855; *DeVoll v. Burdick Painting, Inc.,* 35 F.3d 408 (9th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1381, 131 L.Ed.2d 234 (1995); *Land v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund,* 25 F.3d 509, 514 (7th Cir.1994); *Smith v. Hartford Ins. Group,* 6 F.3d 131, 136 (3d Cir.1993); *Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 95 (3d Cir.1992); *Reichelt v. Emhart Corp.,* 921 F.2d 425, 430 (2d Cir.1990), *cert. denied,* 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); *Alday v. Container Corp. of Am.,* 906 F.2d 660, 663 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *Sejman v. Warner–Lambert Co., Inc.,* 889 F.2d 1346, 1348 (4th Cir.1989), *cert. denied,* 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); *Musto v. American Gen. Corp.,* 861 F.2d 897, 901 & n. 2 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *West v. Greyhound*

*Corp.,* 813 F.2d 951, 954 (9th Cir.1987); *Molnar v. Wibbelt,* 789 F.2d 244, 250 (3d Cir. 1986); *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.,* 724 F.2d 406, 410 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984); *Anderson,* 836 F.2d at 1516. "Accordingly, a plan participant's interest in welfare benefits is not automatically vested, and employers have a statutory right to 'amend the terms of the plan or terminate it entirely.'" *Gable,* 35 F.3d at 855 (quoting *Biggers v. Wittek Indus., Inc.,* 4 F.3d 291, 295 (4th Cir.1993)); *see also Doe v. Group Hospitalization & Medical Servs.,* 3 F.3d 80, 84 (4th Cir.1993); *Wise,* 986 F.2d at 935. Thus, "[a]n employer may unilaterally modify or terminate health benefits 'absent the employer's contractual agreement to the contrary,' even if some benefits have been paid." *John Morrell & Co. v. United Food and Commercial Workers Int'l Union AFL–CIO,* 37 F.3d 1302, 1303–04 (8th Cir. 1994) (citations omitted), *cert. denied,* — U.S. ——, 115 S.Ct. 2251, 132 L.Ed.2d 259 (1995).

Congress' rationale in not imposing vesting requirements on welfare plans was its determination that "[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income.'" *In re Unisys Corp. Retiree Medical Ben. ERISA Litigation,* 58 F.3d at 901 (quoting *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1160 (3d Cir.1990) (citing in turn H.Rep. No. 807, 93rd Cong., 2d Sess. 60, reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4726)). As the Second Circuit observed:

> Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs.

*Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988).

■ Nonetheless, in some situations, a welfare plan may provide a vested benefit. *In re Unisys Corp. Retiree Medical Ben. ERISA Litigation*, 58 F.3d at 901; *Gable*, 35 F.3d at 855; *Alexander*, 967 F.2d at 95; *Wise*, 986 F.2d at 937. "An employer may 'waive[ ] its statutory right to modify or terminate benefits,' however, by voluntarily undertaking an obligation to provide vested, unalterable benefits." *Gable*, 35 F.3d at 855 (quoting *Wise*, 986 F.2d at 937); *see Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir.1993). However, because the vesting of rights in a welfare plan constitutes an extra-ERISA commitment, "courts may not lightly infer the existence of an agreement to vest employee welfare benefits." *Gable*, 35 F.3d at 855; *see John Morrell & Co.*, 37 F.3d at 1304; *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir.1988), *cert. denied*, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989); *Howe v. Varity Corp.*, 896 F.2d 1107, 1110 (8th Cir.1990); *Wise*, 986 F.2d at 938.

■ Importantly, Plaintiffs bear the burden of proving that the ERISA plan at issue contains vested benefits. *John Morrell & Co.*, 37 F.3d at 1304; *Gable*, 35 F.3d at 855; *Howe*, 896 F.2d at 1109; *Anderson*, 836 F.2d at 1517; *Local Union No. 150–A, United Food and Commercial Workers Int'l Union AFL–CIO v. Dubuque Packing*, 756 F.2d 66, 69–70 (8th Cir.1985); *see also Tusting v. Bay View Fed. Sav. & Loan Ass'n*, 789 F.Supp. 1034, 1041 (N.D.Cal.1992) (citing *Howe*, 896 F.2d at 1109). Extra–ERISA commitments, such as the vesting of health benefits, must be found in the plan documents and stated in clear and express language. *In re Unisys Corp. Retiree Medical Ben. ERISA Litigation*, 58 F.3d at 901; *Wise*, 986 F.2d at 929; *see also Alday*, 906 F.2d at 665 ("[A]ny retiree's right to lifetime medical benefits at a particular cost can only be found if it is established under the terms of the ERISA-governed benefit plan document"). Thus, a court must examine the plan documents to determine whether the employer intended to confer vested benefits. *Boyer*, 986 F.2d at 1002–04. Therefore, here

the court must analyze the provisions of the plan documents to determine whether Swift intended to confer vested benefits upon its retirees.

### 1. Coverage Under the Plan

■ The court will initially take up Beatrice's assertion that because all Plaintiffs retired prior to January 1, 1979, they were not covered under the Plan. The court first notes that the 1976–79 Master Agreement did not confer benefits to retirees under that agreement's prescription drug plan. Rather, prescription drug benefits for retirees were included in the 1976–79 Master Agreement's Hospital–Medical–Surgical Plan for Pensioners, and it provided in relevant part:

> The Company shall make available at its own expense for each enrolled employe who retires on immediate pension under the ESMARK, INC. Pension Plan for Non–Salaried Employees after March 31, 1967, and for his legal spouse, if any, at the time of retirement:
>
> . . . .
>
> 2. Coverage in accordance with and at the same level as, the ESMARK, INC. MAJOR MEDICAL PLAN 2 which was available to eligible employees on August 31, 1976, except that such plan will be modified to:
>
> > (a) include prescription drugs as a covered expense not subject to the deductible amount.

The 1976–79 Master Agreement at 196–97. The Major Medical Plan provided, for those employees who retired prior to September 1, 1976, for payment of seventy-five percent of the prescription drug costs and required no deductible amount. For those employees who retired on or after September 1, 1976, the Major Medical Plan provided for payment of eighty percent of the prescription drug costs and required no deductible amount. Thus, retirees under the 1976–79 Master Agreement were ineligible to participate in the Plan's Prescription Drug Plan.

The 1979–82 Master Agreement opened the Plan's Prescription Drug Plan to some retirees. The 1979–82 Master Agreement, however, only opened the Plan's Prescription

Drug Program to those employees who retired after August 31, 1979. The provision of the 1979–82 Master Agreement extending the Plan to some retirees provides, in pertinent part:

> The Company shall make available at it own expense for each enrolled employee who retires on immediate pension under the ESMARK, INC. Pension Plan for Non–Salaried Employees after August 31, 1979 and for his legal spouse and dependents, if any, at the time of retirement:
>
> . . . .
>
> 3. The Prescription Drug Card Plan which was available to eligible employees and their dependents on August 31, 1979 modified to provide for a deductible of one dollar and seventy-five cents ($1.75) for each prescription.

The 1979–82 Master Agreement at 188–89. Thus, under unambiguous language of the 1979–82 Master Agreement, those retirees who retired before August 31, 1979, are not covered under the Plan's Prescription Drug Program. The excluded group of retirees includes all Plaintiffs, since they all retired prior to January 1, 1979. Because the Plan did not provide Plaintiffs with benefits under its Prescription Drug Program, Plaintiffs cannot claim to have a vested right to such Plan benefits and their ERISA claim must be denied. Therefore, the court grants Defendant Beatrice's Motion for Summary Judgment with respect to Plaintiffs' claim brought under ERISA.

### 2. Vesting of Prescription Drug Benefits

█ Alternatively, assuming that Plaintiffs were covered under the Plan's Prescription Drug Program, the court will address whether Plaintiffs have a vested right in the prescription drug benefits conferred under the Plan. Beatrice directs the court's attention to the absence of any provisions in the plan documents explicitly vesting Swift's employees with rights to prescription drugs. Neither the 1976–79 Master Agreement nor the 1979–82 Master Agreement contains a

provision which explicitly grant Swift's retirees lifetime prescription drug benefits. The absence of such language is significant. *John Morrell & Co.*, 37 F.3d at 1307 (noting that "[t]he absence of any explicit vesting language ... is strong evidence of the parties' intent to limit retiree benefits to the term of the Master Agreement. "); *Wise*, 986 F.2d at 938 (commenting that "[t]o prevail, Plaintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation [of defendant employer's ability to change benefits].". Nor should this court interpret the absence of explicit vesting language in the plan documents as an agreement to vest Plaintiffs' prescription drug benefits. *See Alday*, 906 F.2d at 664 (Having concluded "any retiree's right to lifetime medical benefits at a particular cost can only be found if it established by contracts," Eleventh Circuit determined employer reserved right to alter or terminate plan).

Next, Beatrice points the court to a number of provisions in the plan documents which evidence a lack of intent on the part of Swift to grant its retirees with vested rights in the Plan's Prescription Drug Program. First, both the 1976–79 Master Agreement and the 1979–82 Master Agreement contain express limitations on their duration. The 1979–82 Master Agreement contains the following durational limitation:

> *Except as otherwise provided, all of the provisions of this Agreement shall take effect as of September 1, 1979, and shall remain in effect until September 1, 1982, and from year to year thereafter, provided, however, that this Agreement may be terminated on September 1, 1982, or on September 1, of any year thereafter by either party by written notice mailed to the Company at its general office, or to the Union at its national headquarters at least sixty (60) days prior to September 1, 1982, or prior to September 1 or any year thereafter.*

The 1979–82 Master Agreement at 98.[13] Additionally, the Plan expressly provides that

---

13. The 1976–79 Master Agreement contains virtually an identical limitation:

> 80. *Terms of Contract:* Except as otherwise provided, all of the provisions of this agreement shall take effect as of September 1, 1976, and shall remain in effect until September 1, 1979, and from year to year thereafter, provided, however, that this agreement may be termi-

its prescription drug benefits under the Plan's Prescription Drug Program are available "for each eligible employe and eligible dependents, only if and while such employe is covered by this Agreement ..." 1976–79 Master Agreement at 130; 1979–82 Master Agreement at 140. The inclusion of such durational provisions in collective bargaining agreements evidences an intent not to provide vested benefits. *See John Morrell & Co.*, 37 F.3d at 1307; *Anderson*, 836 F.2d at 1519. As the Eighth Circuit observed in *John Morrell & Co.*, the inclusion of similar language

> was inconsistent with an intent to vest health benefits for life: "[i]t would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date."

*John Morrell & Co.*, 37 F.3d at 1307 (quoting *Anderson*, 836 F.2d at 1519).

A further consideration is the fact that the Plan contained a coordination of benefits provision. As the Eighth Circuit has noted, the inclusion of such a provision is inconsistent with the notion of vesting. *See John Morrell*, 37 F.3d at 1307; *Anderson*, 836 F.2d at 1519. In *Anderson*, the court observed: "We agree with the district court that 'the Plan cannot be interpreted to provide vested rights for prior retirees in one provision and to take such rights away in another.'" *Anderson*, 836 F.2d at 1519. Thus, the clear import of the Plan's unambiguous language is that the Plan's prescription drug benefits are not vested.

Plaintiffs, however, contend that language contained in the Plan documents constitutes a promise that prescription drug benefits are vested for life upon an employee's retirement. Specifically, Plaintiffs point to language in the 1976–79 Master Agreement which provides that coverage under that agreement's Hospital–Medical–Surgical Plan for Pensioners ceases as of the date of death of the retired employee. *See* 1976–79 Master Agreement at 197. Plaintiffs also direct the court's attention to the termination of coverage section in the Major Medical Plan which provides that coverage for spouses terminates at either the death of the pensioner or upon divorce. *See* The Esmark Major Medical Plan 2, for Certain Non–Salaried Employees Retired Prior to 9/1/76 at 10; The Esmark Major Medical Plan 2, for Certain Non–Salaried Employees Retired On or After September 1, 1976 at 11. The later provision is clearly inapplicable since it pertains only to spouses of pensioners and not to the termination of benefits of a retiree. This provision merely links benefits that a spouse of a retiree may receive under the Major Medical Plan to the spouse's continued association with the retiree. It is completely silent as to the vesting of prescription drug benefits to retirees under the Plan. The former provision relied on by Plaintiffs is equally unavailing since the cited language in the 1976–79 Master Agreement is not found in the Prescription Drug Plan but rather in the Hospital–Medical–Surgical Plan for Pensioners. This is particularly significant given the fact that the 1976–79 Master Agreement's Prescription Drug Plan did not extend the Plan's prescription drug benefits to retirees. Thus, the court finds that neither of the provisions relied on by Plaintiffs states in clear and express language that the Plan's prescription drug benefits was vested.[14] *See In re Unisys Corp. Retiree Medical Ben. ERISA Litigation*, 58 F.3d at 901; *Wise*, 986 F.2d at 929; *see also Alday*, 906 F.2d at 665. Therefore, the court concludes that Plaintiffs have failed to meet their burden of establish-

---

nated on September 1, 1979, or on September 1, of any year thereafter by either party by written notice mailed to the Company at its General Office, or to the Union at its national headquarters at least sixty (60) days prior to September 1, 1979, or prior to September 1 or any year thereafter.
The 1976–79 Master Agreement at 88.

**14.** The court notes that Plaintiffs have presented extrinsic evidence, in the form of affidavits and deposition testimony, on the issue of whether the Plan contained vested prescription drug benefits. However, "extrinsic evidence may not be used to create an ambiguity in a pension or welfare agreement subject to ERISA." *Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1259 (7th Cir.1994) (citing *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607–08 (7th Cir.1993) (en banc) and *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1187 (7th Cir.1994)).

ing that the Plan contains vested prescription drug benefits. *See John Morrell & Co.,* 37 F.3d at 1304; *Gable,* 35 F.3d at 855; *Howe,* 896 F.2d at 1109; *Anderson,* 836 F.2d at 1517; *Dubuque Packing,* 756 F.2d at 69–70. Accordingly, because Plaintiffs' interests were not vested, Beatrice had a statutory right to amend the terms of the Plan's prescription drug benefits. *See Gable,* 35 F.3d at 855; *Biggers,* 4 F.3d at 295; *see also Doe,* 3 F.3d at 84; *Wise,* 986 F.2d at 935.

### C. Claim Under the Labor Management Relations Act

■ Beatrice also moves for summary judgment on Plaintiffs' claims that its actions constitute a breach of the collective bargaining contracts in violation of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Section 301 of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Section 301 applies, by its terms, to suits for breaches of collective bargaining agreements. *See Wooddell v. International Bhd. of Elec. Workers Local 71,* 502 U.S. 93, 98, 112 S.Ct. 494, 498, 116 L.Ed.2d 419 (1991) ("[A] suit properly brought under § 301 must be a suit ... for violation of a contract between an employer and a labor organization....").

In *Carpenters Local No. 1846 v. Pratt–Farnsworth, Inc.,* 690 F.2d 489, 500 (5th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983), the Fifth Circuit held: "A section 301 claim must satisfy three requirements: (1) a claim of violation of (2) a contract (3) between an employer

and a labor organization." *Id.; see Stevens v. Employer–Teamsters Joint Council No. 84 Pension Fund,* 979 F.2d 444, 455 (6th Cir. 1992); *United Paperworkers Int'l Union v. International Paper Co.,* 920 F.2d 852, 859 (11th Cir.1991); *Baton Rouge Bldg. and Constr. Trades Council v. Jacobs Constructors, Inc.,* 804 F.2d 879, 882 (5th Cir.1986); *Painting and Decorating Contractors Ass'n of Sacramento, Inc. v. Painters and Decorators Joint Committee of East Bay Counties, Inc.,* 707 F.2d 1067, 1070 (9th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984); *see also Alvares v. Erickson,* 514 F.2d 156, 161 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975); *Province v. Cleveland Press Pub. Co.,* 571 F.Supp. 855, 860 (N.D.Ohio 1983).

■ Beatrice asserts that a § 301 suit may not be brought against it for violation of the labor contracts at issue in this litigation since it was not a party to the contracts.[15] Courts have almost unanimously held that a section 301 suit may be brought for violation of a labor contract only against those who are parties to the contract at issue. *See Pratt–Farnsworth, Inc.,* 690 F.2d at 501; *see also United Food and Commercial Workers Local 951 v. Mulder,* 31 F.3d 365, 369 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995); *International Union, United Mine Workers of Am. v. Covenant Coal Corp.,* 977 F.2d 895, 897 (4th Cir.1992); *United Food and Commercial Workers Union, Local No. 1564 v. Quality Plus Stores, Inc.,* 961 F.2d 904, 905 (10th Cir.1992); *Xaros v. United States Fidelity and Guar. Co.,* 820 F.2d 1176, 1181 (11th Cir.1987); *Service Hosp., Local No. 47 v. Commercial Property Servs.,* 755 F.2d 499, 505 (6th Cir.1985), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985); *Loss v. Blankenship,* 673 F.2d 942, 946 (7th Cir. 1982); *Metropolitan Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.,* 672 F.2d 580, 583 (6th Cir.1982); *Ramsey v. Signal Delivery Serv., Inc.,* 631 F.2d 1210, 1212 (5th

---

**15.** Section 301 permits suits both by unions and by individual union members "seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge." *Hines v. Anchor Motor Freight, Inc.,*

424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976) (quoting *Smith v. Evening News Ass'n,* 371 U.S. 195, 198–200, 83 S.Ct. 267, 269–70, 9 L.Ed.2d 246 (1962)).

Cir.1980); *Teamsters Local Union No. 30 v. Helms Express, Inc.*, 591 F.2d 211, 217 (3d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1979); *Baker v. Fleet Maintenance, Inc.*, 409 F.2d 551, 554 (7th Cir.1969); *Bowers v. Ulpiano Casal, Inc.*, 393 F.2d 421, 423 (1st Cir.1968); *Aacon Contracting Co. v. Association of Catholic Trade Unionists*, 276 F.2d 958 (2d Cir.1960), *aff'g and adopting* 178 F.Supp. 129, 130 (E.D.N.Y.1959); *Haspel v. Bonnaz, Singer & Hand Embroiderers Local 66*, 216 F.2d 192 (2d Cir.1954), *aff'g and adopting* 112 F.Supp. 944, 945 (S.D.N.Y. 1953); *Cruz v. Robert Abbey, Inc.*, 778 F.Supp. 605, 610 (E.D.N.Y.1991); *Fox v. Mitchell Transport, Inc.*, 506 F.Supp. 1346, 1349 (D.Md.), *aff'd mem.*, 671 F.2d 498 (4th Cir.1981); *Fabian v. Freight Drivers & Helpers Local No. 557*, 448 F.Supp. 835, 838 (D.Md.1978); *Mason Tenders Dist. Council Welfare Fund v. Dalton*, 648 F.Supp. 1309, 1310 (S.D.N.Y.1986). *But see Painting and Decorating Contractors Ass'n of Sacramento*, 707 F.2d at 1071 ("All that is required for jurisdiction to be proper under § 301(a) is that the suit be based on an alleged breach of contract between an employer and a labor organization and that the resolution of the lawsuit be focused upon and governed by the terms of the contract."); *Wilkes–Barre Publishing Co. v. Newspaper Guild Local 120*, 647 F.2d 372, 379–81 (3d Cir.1981) (in holding that a federal court has jurisdiction over a section 301 suit brought against a non-party to a collective bargaining agreement who allegedly induces a party to breach the agreement, court stated that "so long as the obligation sought to be enforced has its source in the provisions of a collective bargaining agreement, remedies for its enforcement may be available under section 301(a) in suits other than on the contract itself."), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982). The court finds the majority position to be the more persuasive. The plain language of section 301 authorizes "[s]uits for violation of contracts between an employer and a labor organization...." 29 U.S.C. § 185. Applying the most natural interpretation of this language, the court concludes that "a suit against a non-signatory of a contract cannot be considered a suit for violation of the contract." *Covenant Coal Corp.*, 977 F.2d at 897. Here, because neither Beatrice nor Esmark were parties to the collective bargaining agreements at issue in this litigation, jurisdiction does not lie under section 301. *See Pratt–Farnsworth, Inc.*, 690 F.2d at 501–02; *Brenner v. Local 514, United Bhd. of Carpenters*, 927 F.2d 1283, 1292 (3d Cir.1991). Therefore, the court grants Beatrice's motion for summary judgment on Plaintiffs' LMRA claim.

## V. CONCLUSION

Initially, the court concludes that under unambiguous language of the 1979–82 Master Agreement, those retirees who retired before August 31, 1979, are not covered under the Plan's Prescription Drug Program. This excluded group of retirees includes all Plaintiffs, since they all retired prior to January 1, 1979. Because the Plan did not provide Plaintiffs with benefits under its Prescription Drug Program, Plaintiffs cannot claim to have a vested right to such Plan benefits. Therefore, the court grants Defendant Beatrice's Motion for Summary Judgment with respect to Plaintiffs' claim brought under ERISA. Alternatively, assuming that Plaintiffs were covered under the Plan's Prescription Drug Program, the court concludes that Plaintiffs do not have a vested right in the prescription drug benefits conferred under the Plan. Thus, because Plaintiffs' interests were not vested, Beatrice had a statutory right to amend the terms of the Plan's prescription drug benefits. Finally, the court concludes that because neither Beatrice nor Esmark were parties to the collective bargaining agreements at issue in this litigation, jurisdiction does not lie under section 301. Therefore, the court also grants Beatrice's motion for summary judgment on Plaintiffs' LMRA claim.

**IT IS SO ORDERED.**